[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This sad and unfortunate case concerns Sarah B., now nearly two years of age, who was born to an incarcerated mother and has been in foster care continuously since she was three days old. The petitioner, the Department of Children and Families (DCF), seeks to terminate the parental rights of the child's mother, Renalda B. The child's father is unknown.
The termination of parental rights petition was filed at the Superior Court for Juvenile Matters in Plainville on May 18, 1996, and the case was subsequently transferred to this venue for trial. The petition originally alleged two grounds for termination pursuant to CGS § 17-112: parental failure to rehabilitate and lack of an ongoing parent-child relationship. On October 22, 1996, by agreement of all the parties, DCF amended its petition to add a third count. The new allegation, made under the recently-enacted Public Act 96-246, claimed failure to CT Page 8972 rehabilitate by the parent of a neglected or uncared for child under seven years of age whose parental rights with respect to another child had previously been terminated. Concerning the initial two counts of its petition, DCF alleged that the grounds for termination had exist for not less than one year prior to the commencement of this action.
PROCEDURAL HISTORY
On December 9, 1994, DCF filed neglect petitions and received an ex parte order of temporary custody concerning Sarah B. at the Superior Court for Juvenile Matters in Montville. On December 14, 1994 the OTC was continued and the case was transferred to the Superior Court for Juvenile Matters in Plainville. On May 10, 1995 at that court, Sarah was adjudicated an uncared for child following a plea by the mother. The court (Keller, J.) committed the child's care and custody to the petitioner for a period of 18 months, and mother signed court-approved expectations which are discussed at greater length elsewhere in this decision. DCF filed its TPR petition on May 18, 1996, and trial in this matter was held at the Child Protection Session on October 22, 1996.
Prior to the commencement of trial on October 22, the court ordered a psychiatric competency evaluation of the respondent mother. The respondent has had a prior history of psychiatric problems. (See In re Alexander V., 233 Conn. 557 (1992)). All counsel, including the mother's attorney and her court-appointed guardian ad litem, stipulated that this evaluation should be conducted. Counsel and the GAL also stipulated that the evaluation would be conducted in the court house that morning by Dr. Richard B. Sadler, a psychiatrist who had previously been appointed by the court to do a psychiatric evaluation of the mother and child in connection with the TPR case. Based on that agreement, Dr. Sadler met with the respondent and conducted an evaluation to determine her competency. He thereafter testified in a competency hearing which the court conducted on October 22, prior to beginning the actual trial. Dr. Sadler testified that Renalda B. was presently competent, in that she understood the nature of the TPR proceedings, and was able to adequately assist her counsel in the presentation of her defense at trial. The psychiatrist's conclusions and findings were not challenged nor controverted by respondent's legal representatives at this hearing. Based on all of the forgoing, the court concluded that the respondent was competent to stand trial, and that her rights in connection with this proceeding could be adequately protected CT Page 8973 through the services of her court-appointed counsel and guardian ad litem.
Prior to the commencement of trial the court, again by agreement of all counsel and the GAL, granted petitioners motion to amend petition, motion for judicial notice, and proposed stipulation of facts.
The TPR hearing was tried in its entirety on October 22, 1996. DCF introduced the testimony of the following witnesses at trial:
1. Dr. Sadler, the court-appointed psychiatrist;
2. Louise B., the child's foster parent;
3. Debra Bell, DCF social worker.
Neither counsel for the respondent mother, nor counsel for the minor child, introduced any witnesses.
FINDINGS OF FACT
Having carefully considered all of the evidence and testimony adduced at trial, the court makes the following factual findings:
Sarah B. was born on December 6, 1994 at the Lawrence Memorial Hospital in New London. Her mother had been sentenced to Niantic Correctional Institution for disorderly conduct in October 1994, and was still incarcerated there on the date of Sarah's birth. Maxine Varanko, a case manager with the hospital's High Risk Infants Program, made a referral of suspected neglect concerning the child to DCF on December 7. (Petitioner's Exhibit 24). In this mandated report, Ms. Varanko noted that the mother would be incarcerated until January 1995 and had requested temporary foster care for Sarah. Ms. Varanko also expressed concern for the child based on the observations by staff of Renalda B's behavior in the hospital. The referral notes in pertinent part: "She [mother] has not been able to provide basic care to the infant in her rooming-in situation in the hospital. She has not remembered to change the baby and has not completed feedings appropriately." (Petitioner's Exhibit 24). Ms. Varanko also alerted DCF that mother might be suffering from mental illness. CT Page 8974
DCF applied for and received an ex parte order of temporary custody on December 9, 1994. On that date, the mother returned to Niantic Correctional Institution after informing DCF that she had no plan for the child's care and that she could not name the child's father. (Stipulation of Fact, Number 7). The petitioner placed Sarah in the licensed foster home of Louise B. in Norwich, where she has continuously remained through the present date. DCF established a weekly visitation schedule for the mother and child at Niantic. (Petitioner's Exhibit 12, Page 4). A DCF family treatment plan indicated that correctional officials had prepared a discharge plan for mother, which included mental health counseling and treatment. (Petitioner's Exhibit 12, Page 4).
Renalda B. was released from Niantic in early January of 1995, and returned to reside in New Britain (Petitioner's Exhibit 8, Page 2). She was referred to a mental health program there known as community Mental Health Associates, Inc. (CMHA). While in New Britain mother had supervised visits with the child once or twice a week until May of 1995. A DCF treatment plan dated December 1, 1995 indicated that "mother did not cooperate with visitation schedule". (Petitioner's Exhibit 12, Page 4). The foster mother transported the child to these visits with the mother in New Britain. Louise B. testified that mother always terminated the visits early, with excuses that she had to be somewhere else. The longest visit was 45 minutes, and the shortest visit lasted only 15 minutes. While respondent was living in New Britain, the foster mother offered to help her relocate to Norwich so that she could live in closer proximity to the child. The mother did not follow through with this offer of assistance.
In February 1995, the respondent was scheduled to be evaluated by Dr. David Mantell, a clinical psychologist in New Britain. This court-ordered examination was to include an individual psychological assessment of the mother, and a parent-child relationship. It was ordered by the court in connection with the then-pending neglect case. Dr. Mantell's report under date of February 19, 1996 was introduced into evidence at the TPR trial. It indicated that the respondent refused to accompany the social worker to Dr. Mantell's office on February 17, 1996, and told the worker "I don't want to see the [expletive] baby." (Petitioner's Exhibit 2]. As a result, the respondent was not seen nor evaluated by Dr. Mantell.
On May 10, 1995, when the child was committed to DCF, the CT Page 8975 mother and her lawyer signed a court-approved expectation form at the Superior Court for Juvenile Matters in Plainville. These expectations spelled out what the respondent had to do in order to achieve reunification with her daughter. (Petitioner's Exhibit 6). Renalda B. promised that she would keep all appointments set by or with DCF, keep DCF and her attorney apprised of her whereabouts, visit her daughter as often as permitted, participate in individual, drug/alcohol, parenting and mental health counseling, undergo a psychiatric evaluation and follow the evaluator's recommendations, secure and maintain adequate housing and income, refrain from substance abuse, sign necessary releases and avoid further involvement with the criminal justice system.
In May 1995, mother was again imprisoned at Niantic, and this time she remained in custody until approximately May of 1996. From May 1995 until February 1996, the foster mother brought the child to Niantic once a month for visits. The visits at Niantic were terminated in February, 1996 at mother's request. Renalda B. told the foster mother that it was "too scary" for the child to visit her through a glass partition at the prison. (Testimony of Louise B.). When the mother left prison in May 1996, she returned to New Britain where she obtained housing on May 13, 1996 at the Friendship Community Center. Per DCF social worker Debra Bell, the mother only remained there until sometime in June 1996, when she was discharged from the program for non-compliance.
From June 1996 until the eve of this trial in October, neither DCF nor the foster mother had information concerning the mother's whereabouts. Respondent's last contact with Sarah occurred during the final visit at Niantic in February 1996. Just prior to the commencement of this trial, Social Worker Bell contacted the Connecticut Department of Corrections to inquire if the respondent was in that agency's custody. She learned that Renalda B. became incarcerated again on September 26, 1996. (Testimony of Debra Bell). The mother was still in DOC custody when this trial was held.
The mother has a history of mental illness and receives Supplemental Social Security Income payments for a psychiatric disability. A report from Community Mental Health Services indicated that respondent was well known to the mental health system and had received various services from CMHA since 1989 (Petitioner's Exhibit 3, Page 1). CMHA records indicate that mother's primary diagnoses were "atypical psychosis" and "cocaine CT Page 8976 abuse." The respondent also has a rather extensive record of criminal convictions for misdemeanors such as prostitution, disorderly conduct, and failure to appear in court. (Petitioner's Exhibit 19).
Dr. Sadler conducted a court-ordered psychiatric evaluation of the mother on July 26, 1995. (Petitioner's Exhibit 1). His report indicated that mother "is chronically mentally ill with a long history of substance abuse and legal difficulties which have resulted in multiple incarcerations." Petitioner's Exhibit 1, Page 6). Dr. Sadler also noted in his report:
 "[Mother's] has shown quite erratic and dysfunctional behaviors as the result of her intellectual limitations as well as her psychiatric impairments which involve psychotic behaviors, judgment impairments, mood instability and erratic judgments. [Her] diagnosis, on the basis of her interview today and the sparse psychological history available for this evaluation (which lacked any medical treatment records, past psychological testing or psychotherapy records), would be Schizophrenia, Polysubstance Abuse, and a strong presumption of intellectual limitations." (Petitioner's Exhibit 1, Pages 6, 7).
According to Dr. Sadler, the 31-year-old mother's mental illness has had "variable periods of exacerbations and remissions" which allowed the respondent to work for up to six months at a time at employment such as a hamburger restaurant when she was in her 20s.
The psychiatrist opined that the mother's judgment "is so seriously impaired at times that she is not aware of her actions and she is not able to control her own emotional state in order to provide minimally adequate care for her infant." (Petitioner's Exhibit 1, Page 7). Dr. Sadler indicated that "because of her incarceration, her Schizophrenia, her intellectual limitations and her erratic lifestyle, [respondent] is not considered by me to be a minimally adequate caretaker for her infant." Petitioner's Exhibit 1, Page 8). He added that "the possibility of a sufficient habilitation of [mother] to perform parenting functions which she has never performed before" was "exceedingly unlikely." (Petitioner's Exhibit 1, Page 8).
As noted above, the respondent has not seen Sarah since last February. Louise B. testified that the child regards her foster parents as her mother and father and does not ask for her CT Page 8977 biological parent.
ADJUDICATION
 1. Failure to Rehabilitate: CGS § 17a-112 (b)(2) defines this ground for termination of parental rights. It applies in those cases where:
 "the parents of a child who has been found by the superior court to have been neglected or uncared for have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the child, they could assume a responsible position in the life of the child."
The term "personal rehabilitation" as used in the forgoing statute has been defined in Connecticut case law to mean "the restoration of a parent to his or her former constructive and useful role as a parent." In re Juvenile Appeal, 1 Conn. App. 463,477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984). See also In re Migdalia M., 6 Conn. App. 194, 203, (1986).
At the time of Sarah's birth, the respondent was not able to perform even the most basic caretaking functions, such as feeding the child, or changing her. She was incarcerated, had no plan for the child or family support system, and had historically engaged in behavior which indicated at times that she could not even adequately care for herself. There has been little or no improvement in the respondent's situation in the nearly two years which have now transpired since then. Renalda B. has been incarcerated twice since her release from prison in January 1995. She was in pre-trial correctional custody at the time of this trial ( on a drug possession charge). (Petitioner's Exhibit 22, Page 2). She was discharged in June 1996 from a residential living program for non-compliance with rules after only a short stay there. Dr. Sadler testified at trial that mother has had a number of treatment interventions for her psychiatric status, and that those treatments did not affect the changes necessary for her to adequately care for Sarah. He opined that there was "very little likelihood" that the respondent would be able to parent the child in the future. The respondent has, for the most part, completely failed to abide by the court-approved expectations to which she agreed when the child was committed. CT Page 8978
Mother's erratic and at times illegal behavior may well be the byproduct of her mental illness, substance abuse and suspected cognitive limitations. Although she contests the TPR and desires reunification, she has demonstrated no insight about the nature and extent of her problems, or how to adequately overcome them. She does not have any of the requisite parenting skills, and all of the evidence adduced at trial supports the conclusion that she will not possess them at any time in the foreseeable future — if ever. This bleak prognosis, and the fact that Sarah has already languished for 23 months in foster care, compel the court to conclude that it would be detrimental to Sarah to allow the mother any further time for efforts at reunification. There is, in short, no reason to believe that the mother would be able within a reasonable period of time to assume a responsible position in the child's life. Accordingly, the court finds that the petitioner has proven the ground of failure to rehabilitate by clear and convincing evidence. The court also finds that petitioner has established by clear and convincing evidence that this ground for termination had existed for not less than one year prior to the commencement of the action, and that, under all of the circumstances, DCF made reasonable efforts to reunify the child with her parent.
2. No Ongoing Parent Child Relationship: CGS § 17a-122 (b) (4) delineates the circumstances under which this non-consensual ground for termination may be granted. The statute defines the lack of an ongoing parent child-relationship to mean the absence of "the relationship which ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child . . ." The court must also find that it would be detrimental to the best interests of the child to allow further time for the establishment or reestablishment of such a parent-child relationship.
Sarah B. has been in DCF foster care since December 9, 1994. Since that date, the mother has had some brief visits with Sarah, the last taking place in February 1996. But sporadic minimal and limited contacts do not constitute an "ongoing, parent-child relationship." "It is reasonable to read the language of `no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, or that despite its former existence, it has now been completely displaced. In re Juvenile Appeal (anonymous),177 Conn. 648, 670, 420 A.2d 875 (1979); In re Jessica M.,217 Conn. 459, 470, 586 A.2d 597 (1991); In re Juvenile Appeal (84-6),
CT Page 89792 Conn. App. 708-709, 483 A.2d 1101 (1984), cert. denied,195 Conn. 801, 487 A.2d 564 (1985); In re Kezia M., 33 Conn. App. 12,21, (1993). The fact that a parent has some contact with a child does not preclude a determination that there has been no on-going parent-child relationship for a period in excess of one year. Inre Juvenile Appeal (Anonymous), supra, 670; In re Kezia M.,
supra, 21.
The biological mother displayed no ability to care for the child during the three days that they were together in the hospital following Sarah's birth. Since December 9, 1994, the foster parents have continuously met the child's physical, emotional, moral and educational needs. The child, now almost two years old, regards her caretakers as her parents, and does not ask about her biological parent. During the parent-child assessment which he conducted as part of the psychiatric evaluation in July 1995, Dr. Sadler saw no indication that the child had bonded with the mother. He also observed no indication of a parent-child relationship between Sarah and Renalda. The mother has had two years in which to attempt to establish a relationship with her child, but has failed to do so (See In reKezia M., supra, 21). She suffers from unfortunate psychiatric, substance abuse, and legal problems, and has been incarcerated for much of the child's life. Her conduct suggests that it is extremely unlikely that she would be able to successfully establish such a relationship in the future. Furthermore, for reasons already discussed at length herein, the court is clearly convinced that it would be detrimental to the best interests of the child to allow the respondent any further time to do so.
Based on all the forgoing, the court finds that the petitioner has established by clear and convincing evidence that no parent-child relationship exists between the biological mother and the child. DCF has also proven by clear and convincing evidence that this ground for termination has existed for not less than one year, and that it made reasonable efforts under all the circumstances of this case to reunify Sarah B. with her parent.
3. Failure to Rehabilitate as per Public Act 96-246: At the outset of trial on October 22, 1996, counsel for all of the parties and the GAL agreed that the petitioner could amend its petition to add a third ground for termination of parental rights, pursuant to Public Act 96-246. The court, based on that stipulation, granted the motion to amend the petition. That law, CT Page 8980 which became effective on October 1, 1996, permits DCF to seek termination of parental rights of a child under seven years of age whose parents have failed to rehabilitate and who have previously had their parental rights terminated with respect to another child. The applicable section of P.A. 96-246 provides that termination may be granted where:
 "The parent of a child, under the age of seven years old who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families."
The parties also stipulated prior to the trial to a number of facts. One such stipulation noted: "in prior proceedings during 1993, the Respondent Mother's parental rights were terminated as to the child Laura B_____." The parties also stipulated that the court take judicial notice of prior judicial proceedings, including "the previous termination of parental rights petition filed by the Department of Children and Families (sic) filed in July of 1993 on behalf of the respondent-mother's older child, Laura Selina B_____, b. 11/9/92, and granted later that same year." Based on the agreement of all counsel and the GAL, the court granted the motion for judicial notice and accepted the proposed stipulation of facts.
In considering this count of the petition, the court has reviewed the holding of In re Migdalia M., supra, 201. That decision notes in pertinent part: "Although the issue of whether parental rights should have been terminated is to be decided by the trial court on the basis of conditions existing at the time of trial . . .there is no legislative or decisional mandate allowing a trial court to decide that issue on the basis of statutes existing at the time of trial, but not in effect when the termination petition was filed. Parents have a constitutionally protected right to raise and care for their children and that protection cannot be diluted by the use of statutory standards enacted subsequent to a petition to terminate that right, absent a counter legislative directive."
The court is aware that the parties stipulated to the CT Page 8981 amendment, and that permission to amend was granted by this court. However, since the date of the amendment, the court has given further consideration to this count, and the law upon which it was predicated. PA 96-246 became effective on October 1, 1996, and the failure to rehabilitate complained of in the amended petition occurred, in large measure, prior to the legislation's effective date. The amended count seeks an adjudication of the respondent based upon conduct and circumstances which transpired prior to the date when PA 96-246 became law. Because of this, and in light of the holding of the Migdalia M. decision, the court, on its own initiative, dismisses that count of the petition.
DISPOSITION
Having found as proven two of the three grounds alleged for termination of the respondent's parental rights, the court will now consider the matter of appropriate disposition in this case.
Sarah has lived in her current foster home placement since December 9, 1994. The DCF social study indicates that the child ". . . has adjusted well to her placement and appears comfortable within her environment." (Petitioner's Exhibit 23, Page 18). That study, which was prepared on March 1, 1996 also notes:
 "Sarah is at a very vulnerable age and is in need of permanency, she has been in the same foster home for over a year and has formed significant attachments to this family. It does not appear as though mother is ever going to be able to assume a responsible position in Sarah's life."
The foster mother, Louise B. was called as a witness at trial. Her testimony and demeanor reflected great warmth and compassion, not only for the child, but also for the respondent. The foster mother has five children of her own, four of whom are adopted. She and her husband are willing to adopt Sarah, and she is also willing to allow the biological mother to visit the child post-adoption, if a TPR occurs. Louise B. testified that the child is accepted as a family member. Sarah refers to the foster parents as her mother and father and, as noted above, does not inquire about her biological parent. Both DCF and the child's attorney advocate termination and adoption by the foster parents as the most appropriate permanency plan for Sarah, and believe that the child has adjusted positively in the foster home. Based on the evidence produced at trial, the court finds that the child has bonded with her foster parents, and that they offer Sarah a CT Page 8982 loving and nurturing home.
Sarah has been in foster care for all but three days of her life. During the 23 months that the child has been in DCF placement, the respondent has offered no indication whatsoever that she will ever habilitate herself to the point that where she could function as a minimally competent parent. Indeed, she continues to experience the same type of persistent substance abuse, mental health and legal problems with the criminal justice system which precipitated the prior TPR in 1993. It would be detrimental to the best interests of the child, who clearly needs the security and stability of an adoptive home, to allow the respondent any further time to attempt reunification.
Before judgment may enter in this matter, the court must make the following findings of fact mandated by CGS § 17a-122 (d):
1. Services offered: DCF made arrangements for the infant to visit the mother at Niantic. Two court ordered psychological evaluations were ordered in this matter. The respondent refused to accompany the social worker to the evaluation scheduled with Dr. Mantell, but did attend the examination by Dr. Sadler. At various times when she was not incarcerated, mother received mental health counseling from CMHA. She also lived briefly in a supervised living program.
2. Reasonable efforts to reunite: During the period of time germane to this proceeding, the mother had three periods of incarceration and one period of time when her whereabouts were unknown to DCF. These factors made it difficult for petitioner to provide reunification services. Nonetheless, DCF offered the mother visitation assistance and a DCF social worker had some contacts with her. DCF was aware that a discharge plan for mother had been prepared by the Department of Corrections and that mother had the benefit of mental health assistance from CMHA, and that she resided for a short period of time in a supervised living program in New Britain. The social study prepared by DCF also indicates that prior to the termination of mother's parental rights with respect to another child in 1993, mother had received services through DCF from CHM.., the Wheeler Clinic, a parent aid program and the Casey Family Reunification Program. (Petitioner's Exhibit 23, Page 16). Under all of the forgoing circumstances, the court finds that the petitioner made reasonable efforts to reunify the child with her parent. CT Page 8983
3. Court orders: No court orders were issued in this case. However, when the child was committed to DCF on May 10, 1995, the mother and her lawyer signed an "expectation" form at court. (Petitioner's Exhibit 6). This form spelled out with specificity what respondent had to do in order to achieve reunification. This expectation form was also signed by the court (Keller, J.). For the most part, these expectations were not fulfilled by the respondent.
4. Feelings and emotional ties with parents andcaretakers: Sarah B. has lived in her current foster placement since she was three days old. She is significantly attached to Louise B. and her husband, and regards them as her parents. The child has not seen her biological mother since February 1996, and does not ask for her. Dr. Sadler observed the biological mother interact with Sarah during his evaluation in July 1995. At that time the child was eight months old. He indicated that the mother interacted appropriately with the infant. He testified at trial that the child did not recognize her mother during that evaluation, and that no parent-child bond was apparent.
5. Age of child: Sarah B is almost two years old. Her date of birth is December 6, 1994.
6. Parental efforts to rehabilitate and reunify: The mother lacked the ability to provide minimally adequate care for Sarah at the time of her birth. Since commitment, that situation has not improved. Dr Sadler testified that he found no prospect that respondent would be able to parent in the future.
7. Impediments to maintaining meaningful relationship:
DCF and the foster mother attempted, without great success, to involve the mother in visitation. The child was transported from the foster home to visit the mother in prison, and at her place of residence after release from custody. On one occasion, mother requested that the prison visits cease. Later on, her whereabouts were unknown to petitioner and the foster parents for a period of time. The mother has not seen the child since February 1996. The respondent could have attempted to establish a relationship with the child, had she been willing and able to do so. While the mother's incarcerations and psychological impairments interfered with this process, no action on the part of any other individual or agency prevented the parent from maintaining such a relationship. CT Page 8984
JUDGMENT
Having considered the seven factors enumerated above, and having found as proven two of the grounds alleged for the termination of respondent's parental rights, it is further found by clear and convincing evidence that it is in Sarah B.'s best interests that the respondent's parental rights be terminated, so that this child may be freed for adoption. The child's age, the length of time she has already spent in foster care, the adjustment which she has made in her foster home and the inability of respondent to function as a parent over an extensive period of time all support the necessity of this disposition.
Accordingly, it is hereby ORDERED that the parental rights of Renalda B. with respect to the minor child Sarah B. be and hereby are terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed statutory parent of Sarah B. for the purpose of securing an adoptive home or other appropriate permanent placement for the child. Said commissioner shall file with the court, no later than 90 days following the date of this judgment, a written report of the progress made towards such permanent placement. If adoption has not been finalized by February 12, 1998, then said commissioner is further ordered to file a Motion for Review of Plan for Terminated Child concerning Sarah B., which shall be heard by the court no later than May 12, 1998.
Entered at Middletown, Connecticut this 12th day of November, 1996.
BY THE COURT:
Dyer, J.